**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA,

　　　　　*Plaintiff,*

　　　　v.

SAFRAN, S.A.,

SAFRAN USA INC.,

　and

RTX CORPORATION,

　　　　　*Defendants.*

## ~~PROPOSED~~ FINAL JUDGMENT

WHEREAS, Plaintiff, United States of America, filed its Complaint on June 17, 2025;

AND WHEREAS, the United States and Defendants, Safran S.A., Safran USA Inc., and RTX Corporation, have consented to entry of this Final Judgment without the taking of testimony, without trial or adjudication of any issue of fact or law, and without this Final Judgment constituting any evidence against or admission by any party relating to any issue of fact or law;

AND WHEREAS, Defendant Safran agrees to make a divestiture to remedy the loss of competition alleged in the Complaint;

AND WHEREAS, Defendants represent that the divestiture and other relief required by this Final Judgment can and will be made and that Defendants will not later raise a claim of

hardship or difficulty as grounds for asking the Court to modify any provision of this Final Judgment;

NOW THEREFORE, it is ORDERED, ADJUDGED, AND DECREED:

## I.    JURISDICTION

The Court has jurisdiction over the subject matter of, and each of the parties to, this action. The Complaint states a claim upon which relief may be granted against Defendants under Section 7 of the Clayton Act (15 U.S.C. § 18).

## II.    DEFINITIONS

As used in this Final Judgment:

A.    "Safran" means Defendant Safran S.A., a French corporation with its headquarters in Paris, France, its successors and assigns, and its subsidiaries, including Defendant Safran USA Inc., divisions, groups, affiliates, partnerships, and joint ventures, and their directors, officers, managers, agents, and employees.

B.    "RTX" means Defendant RTX Corporation, a Delaware corporation with its headquarters in Arlington, Virginia, its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships, and joint ventures, and their directors, officers, managers, agents, and employees.

C.    "Woodward" means Woodward, Inc., a Delaware corporation with its headquarters in Fort Collins, Colorado, its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships, and joint ventures, and their directors, officers, managers, agents, and employees.

D.    "Acquirer" means Woodward.

E.      "Divestiture Business" means (1) Safran's North American actuation business, including the entirety of the business activities and assets engaged in the development, manufacture, and sale of trimmable horizontal stabilizer actuators ("THSAs"), secondary flight control actuation products and nose-wheel steering gearboxes; and (2) Safran Electronics & Defense, Canada Inc. ("SEDC"), Safran's Canada-based electronic control units business.

F.      "Divestiture Assets" means all of Defendant Safran's rights, titles, and interests in and to all property and assets related to the Divestiture Business, tangible and intangible, wherever located, relating to or used in connection with the Divestiture Business, including:

> 1.      the long-term leases for the facilities located at 2000 and 2020 Fisher Dr., Peterborough, ON K9J 6X6, Canada;
>
> 2.      the Transitional Safran Brands License;
>
> 3.      all other real property, including fee simple interests, real property leasehold interests and renewal rights thereto, improvements to real property, and options to purchase any adjoining or other property, together with all buildings, facilities, and other structures;
>
> 4.      all tangible personal property, including fixed assets, machinery and manufacturing equipment, tools, vehicles, inventory, materials, office equipment and furniture, computer hardware, and supplies;
>
> 5.      all contracts, contractual rights, and customer relationships (including contracts for the supply of THSAs to Airbus, S.E) and all other agreements, commitments, and understandings, including supply agreements, teaming agreements, and leases, and all outstanding offers or solicitations to enter into a similar arrangement;

6.      all licenses, permits, certifications, approvals, consents, registrations, waivers, and authorizations, including those issued or granted by any governmental organization, and all pending applications or renewals;

7.      all records and data, including (a) customer lists, accounts, sales, and credits records, (b) production, repair, maintenance, and performance records, (c) manuals and technical information Defendant Safran provides to its own employees, customers, suppliers, agents, or licensees, (d) records and research data concerning historic and current research and development activities, including designs of experiments and the results of successful and unsuccessful designs and experiments, and (e) drawings, blueprints, and designs;

8.      all intellectual property owned, licensed, or sublicensed, either as licensor or licensee, including (a) patents, patent applications, and inventions and discoveries that may be patentable, (b) registered and unregistered copyrights and copyright applications, and (c) registered and unregistered trademarks, trade dress, service marks, trade names, and trademark applications; and

9.      all other intangible property, including (a) commercial names and d/b/a names, (b) technical information, (c) computer software and related documentation, know-how, trade secrets, design protocols, specifications for materials, specifications for parts, specifications for devices, safety procedures (e.g., for the handling of materials and substances), quality assurance and control procedures, (d) design tools and simulation capabilities, and (e) rights in internet web sites and internet domain names.

*Provided, however*, that the assets specified in Paragraphs II.F.1–9 above do not include the Excluded Assets.

G. "Divestiture Date" means the date on which the Divestiture Assets are divested to Acquirer pursuant to this Final Judgment.

H. "Excluded Assets" means (1) the interests in the facilities located at Av. Sierra San Agustín 2498, Col el Porvenir, Parque Industrial Progreso, and 21185 Mexicali, B.C., Mexico and 1833 Alton Parkway, Irvine, California, United States; (2) any intellectual property associated with the brand names Safran and SEDA; and (3) the contracts to supply: (i) Virgin Galactic with the mechanical portion of an electromechanical THSA actuator (on a build to print basis), (ii) the signal interface unit for user ("SIFU") remote data concentrator for Archer Aviation, Inc., (iii) the French legacy THSA activity consisting of original equipment THSAs produced at Safran's facilities in Mantes, Fougères, Montluçon, and Auxerre, France, for the Embraer KC-390 Millenium, the Bombardier CL650, the Pilatus PC-24 and the Piaggio P.180; (iv) the maintenance, repair, and operation services and related spare parts for the Mitsubishi Heavy Industries (MHI) CRJ family; and (v) Bell with actuation products unrelated to THSAs for helicopters.

I. "Including" means including, but not limited to.

J. "Regulatory Approvals" means (1) any approvals or clearances from the Committee on Foreign Investment in the United States ("CFIUS") or under antitrust or competition laws that are required for the Transaction to proceed; and (2) any approvals or clearances under antitrust or competition laws that are required for Acquirer's acquisition of the Divestiture Assets to proceed.

K. "Relevant Personnel" means (1) all full-time, part-time, or contract employees, wherever located, whose job responsibilities relate in any way to the Divestiture Business at any time between June 14, 2023, and the Divestiture Date and (2) the employees in the positions

listed in Schedule A. The United States, in its sole discretion, will resolve any disagreement relating to which employees are Relevant Personnel.

L.        "Transaction" means the proposed acquisition of part of Collins Aerospace flight control and actuation business from RTX by Safran.

M.        "Transitional Safran Brands License" means a non-exclusive, non-transferrable, non-sublicensable, fully paid-up, worldwide license to use the marks "Safran" and "SEDA" in connection with the products and services provided under the agreements described in Section IV.K for a time period equal to the duration of those agreements and any extensions approved by the United States and a non-exclusive, non-transferrable, non-sublicensable, fully paid-up, worldwide license to use the name "SEDC" for 180 days from the Divestiture Date.

## III.    APPLICABILITY

A.        This Final Judgment applies to Safran and RTX, as defined above, and all other persons in active concert or participation with any Defendant who receive actual notice of this Final Judgment.

B.        If, prior to complying with Section IV of this Final Judgment, Defendants sell or otherwise dispose of all or substantially all of their assets or of business units that include the Divestiture Assets, Defendants must require any purchaser to be bound by the provisions of this Final Judgment. Defendants need not obtain such an agreement from Acquirer.

## IV.    DIVESTITURE

A.        Defendants are ordered and directed, within 90 calendar days after the Court's entry of the Asset Preservation and Hold Separate Stipulation and Order in this matter or within 90 calendar days after Regulatory Approvals are received, whichever is later, to divest the Divestiture Assets in a manner consistent with this Final Judgment to Woodward. The United

States, in its sole discretion, may agree to one or more extensions of this time period and will notify the Court of any extension.

B.  For all contracts, agreements, and customer or supplier relationships (or portions of such contracts, agreements, and customer or supplier relationships) included in the Divestiture Assets, Defendant Safran must assign or otherwise transfer all contracts, agreements, and customer or supplier relationships, including contracts for the supply of THSAs to Airbus, S.E., to Acquirer; *provided, however,* that for any contract or agreement that requires the consent of another party to assign or otherwise transfer, Defendant Safran must use best efforts to accomplish the assignment or transfer. Defendants must not interfere with any negotiations between Acquirer and a contracting party.

C.  Defendants must use best efforts to divest the Divestiture Assets as expeditiously as possible. Defendants must take no action that would jeopardize the completion of the divestiture ordered by the Court, including any action to impede the permitting, operation, or divestiture of the Divestiture Assets.

D.  Unless the United States otherwise consents in writing, divestiture pursuant to this Final Judgment must include the entire Divestiture Assets and must be accomplished in such a way as to satisfy the United States, in its sole discretion, that the Divestiture Assets can and will be used by Acquirer as part of a viable, ongoing business for the development, manufacture, and sale of THSAs and that the divestiture to Acquirer will remedy the competitive harm alleged in the Complaint.

E.  The divestiture must be made to an Acquirer that, in the United States' sole judgment, has the intent and capability, including the necessary managerial, operational,

technical, and financial capability, to compete effectively in the development, manufacture, and sale of THSAs.

F.      The divestiture must be accomplished in a manner that satisfies the United States, in its sole discretion, that none of the terms of any agreement between Acquirer and Defendants give Defendants the ability unreasonably to raise Acquirer's costs, to lower Acquirer's efficiency, or otherwise interfere in the ability of Acquirer to compete effectively in the development, manufacture, and sale of THSAs.

G.      Defendant Safran must provide Acquirer with (1) access to make inspections of the Divestiture Assets; (2) access to all environmental, zoning, and other permitting documents and information relating to the Divestiture Assets; and (3) access to all financial, operational, or other documents and information relating to the Divestiture Assets that would customarily be provided as part of a due diligence process. Defendants also must disclose all encumbrances on any part of the Divestiture Assets, including on intangible property.

H.      Defendant Safran must cooperate with and assist Acquirer in identifying and, at the option of Acquirer, hiring all Relevant Personnel, including:

1.      Within 10 business days following the filing of the Complaint in this matter, Defendant Safran must identify all Relevant Personnel to Acquirer and the United States, including by providing organization charts covering all Relevant Personnel.

2.      Within 10 business days following receipt of a request by Acquirer, the United States, or the monitor, Defendant Safran must provide to Acquirer, the United States, and the monitor additional information relating to Relevant Personnel, including name, job title, reporting relationships, past experience, responsibilities, training and educational histories, relevant certifications, and job performance evaluations. Defendant Safran must also provide to

Acquirer, the United States, and the monitor information relating to current and accrued compensation and benefits of Relevant Personnel, including most recent bonuses paid, aggregate annual compensation, current target or guaranteed bonus, if any, any retention agreement or incentives, and any other payments due, compensation or benefits accrued, or promises made to the Relevant Personnel. If Defendant Safran is barred by any applicable law from providing any of this information, Defendant Safran must provide, within 10 business days following receipt of the request, the requested information to the full extent permitted by law and also must provide a written explanation of Defendant Safran's inability to provide the remaining information, including specifically identifying the provisions of the applicable laws.

        3.     At the request of Acquirer, Defendant Safran must promptly make Relevant Personnel available for private interviews with Acquirer during normal business hours at a mutually agreeable location.

        4.     Defendants must not interfere with any effort by Acquirer to employ any Relevant Personnel. Interference includes offering to increase the compensation or improve the benefits of Relevant Personnel unless (a) the offer is part of a company-wide increase in compensation or improvement in benefits that was announced prior to June 14, 2023, or (b) the offer is approved by the United States in its sole discretion. Defendants' obligations under this Paragraph IV.H.4. will expire 180 calendar days after the Divestiture Date.

        5.     For Relevant Personnel who elect employment with Acquirer within 180 calendar days of the Divestiture Date, Defendant Safran must waive all non-compete and non-disclosure agreements; vest and pay to the Relevant Personnel (or to Acquirer for payment to the employee) on a prorated basis any bonuses, incentives, other salary, benefits or other compensation fully or partially accrued at the time of the transfer of the employee to Acquirer;

vest any unvested pension and other equity rights; and provide all other benefits that those Relevant Personnel otherwise would have been provided had the Relevant Personnel continued employment with Defendant Safran, including any retention bonuses or payments. Defendant Safran may maintain reasonable restrictions on disclosure by Relevant Personnel of Defendant Safran's proprietary non-public information that is unrelated to the Divestiture Assets and not otherwise required to be disclosed by this Final Judgment.

6.      For a period of 12 months from the Divestiture Date, Defendant Safran may not solicit to rehire Relevant Personnel who were hired by Acquirer within 180 calendar days of the Divestiture Date unless (a) an individual is terminated or laid off by Acquirer or (b) Acquirer agrees in writing that Defendant Safran may solicit to re-hire that individual. Nothing in this Paragraph IV.H.6. prohibits Defendants from advertising employment openings using general solicitations or advertisements and re-hiring Relevant Personnel who apply for an employment opening through a general solicitation or advertisement.

I.      Defendant Safran must warrant to Acquirer that (1) the Divestiture Assets will be operational and without material defect on the date of their transfer to Acquirer; (2) there are no material defects in the environmental, zoning, or other permits relating to the operation of the Divestiture Assets; and (3) Defendant Safran has disclosed all encumbrances on any part of the Divestiture Assets, including on intangible property. Following the sale of the Divestiture Assets, Defendants must not undertake, directly or indirectly, challenges to the environmental, zoning, or other permits relating to the operation of the Divestiture Assets.

J.      Defendant Safran must use best efforts to assist Acquirer to obtain all necessary licenses, registrations, and permits to operate the Divestiture Business. Until Acquirer obtains the necessary licenses, registrations, and permits, Defendant Safran must provide Acquirer with the

benefit of Defendant Safran's licenses, registrations, and permits to the full extent permissible by law.

K.      At the option of Acquirer, subject to approval by the United States in its sole discretion, on or before the Divestiture Date, Defendant Safran must enter into a contract or contracts for the operation of the portion of the Divestiture Assets located at Av. Sierra San Agustín 2498, Col el Porvenir, Parque Industrial Progreso, and 21185 Mexicali, B.C., Mexico, facilities, sufficient to meet Acquirer's needs, as determined by Acquirer, for a period of up to 24 months, on terms and conditions reasonably related to market conditions for such asset operation. At the option of Acquirer, subject to approval by the United States in its sole discretion, Defendant Safran must enter into one or more extensions of any such contracts for a total of up to an additional 12 months, on terms and conditions reasonably related to market conditions for such asset operation. Any amendment to or modification of any provision of any such contract or extension must first be approved by the United States, in its sole discretion. If Acquirer seeks an extension of the term of any such contract, Defendant Safran must notify the United States in writing at least 30 days prior to the date the contract expires. Acquirer may terminate such a contract (including an extension), or any portion of such a contract (including an extension), without cost or penalty upon 60 calendar days' written notice. The employees of Defendant Safran tasked with operation of the Divestiture Assets located in Mexicali must not share any competitively sensitive information of Acquirer with any employee of Defendants other than those tasked with providing operation services.

L.      At the option of Acquirer, and subject to approval by the United States in its sole discretion, on or before the Divestiture Date, Defendant Safran must enter into a contract to provide transition services for back office, human resources, accounting, employee health and

safety, and information technology services and support for a period of up to 24 months, on terms and conditions reasonably related to market conditions for the provision of the transition services. At the option of Acquirer, subject to approval by the United States in its sole discretion, Defendant Safran must enter into one or more extensions of any contracts to provide transition services for a total of up to an additional 12 months, on terms and conditions reasonably related to market conditions for the provision of the transition services. Any amendment to or modification of any provision of a contract or extension to provide transition services must first be approved by the United States, in its sole discretion. If Acquirer seeks an extension of the term of any contract for transition services, Defendants must notify the United States in writing at least 30 calendar days prior to the date the contract expires. Acquirer may terminate a contract (including an extension) for transition services, or any portion of a contract (including an extension) for transition services, without cost or penalty at any time upon 30 calendar days' written notice. The employees of Defendant Safran tasked with providing transition services must not share any competitively sensitive information of Acquirer with any other employee of Defendants, other than those tasked with providing transition services.

M.     At the option of Acquirer, and subject to approval by the United States in its sole discretion, on or before the Divestiture Date, Defendants must enter into a lease or assignment of a lease for Suite 3, Section 1 on the first floor of 1733 Alton Parkway, Irvine, California 92614 for a period of up to 12 months, on terms and conditions reasonably related to market conditions for such leases. At the option of Acquirer, subject to approval by the United States in its sole discretion, Defendants must enter into one or more extensions of any lease for a total of up to an additional 12 months, on terms and conditions reasonably related to market conditions for such leases. Any amendment to or modification of any provision of a lease or extension must

first be approved by the United States, in its sole discretion. If Acquirer seeks an extension of the term of any lease, Defendants must notify the United States in writing at least 30 calendar days prior to the date the lease expires. Acquirer may terminate a lease (including an extension), or any portion of a lease (including an extension), without cost or penalty at any time upon 30 calendar days' written notice.

N.      If any term of an agreement between Defendants and Acquirer, including an agreement to effectuate the divestiture required by this Final Judgment, varies from a term of this Final Judgment, to the extent that Defendants cannot fully comply with both, this Final Judgment determines Defendants' obligations.

## V.      FINANCING

Defendants may not finance all or any part of Acquirer's purchase of all or part of the Divestiture Assets.

## VI.     ASSET PRESERVATION AND HOLD SEPARATE

Defendants must take all steps necessary to comply with the Asset Preservation and Hold Separate Stipulation and Order entered by the Court.

## VII.    AFFIDAVITS

A.      Within 20 calendar days of the filing of the Complaint in this matter, and every 30 calendar days thereafter until the divestiture required by this Final Judgment has been completed, each Defendant must deliver to the United States an affidavit, signed by each Defendant's Chief Financial Officer and General Counsel, describing in reasonable detail the fact and manner of that Defendant's compliance with this Final Judgment. The United States, in its sole discretion, may approve different signatories for the affidavits.

B.     Defendants must keep all records of any efforts made to divest the Divestiture Assets until one year after the Divestiture Date.

C.     Within 20 calendar days of the filing of the Complaint in this matter, Defendants must deliver to the United States an affidavit signed by Defendants' Chief Financial Officer and General Counsel that describes in reasonable detail all actions that Defendant Safran has taken and all steps that Defendants have implemented on an ongoing basis to comply with Section VI of this Final Judgment. The United States, in its sole discretion, may approve different signatories for the affidavits.

D.     If a Defendant makes any changes to actions and steps described in affidavits provided pursuant to Paragraph VII.C., the Defendant must, within 15 calendar days after any change is implemented, deliver to the United States an affidavit describing those changes.

E.     Defendants must keep all records of any efforts made to comply with Section VI until one year after the Divestiture Date.

## VIII.  APPOINTMENT OF MONITOR

A.     Upon application of the United States in its sole discretion, which Defendants may not oppose, the Court will appoint a monitor selected by the United States and approved by the Court. Defendants may propose candidates for the monitor appointment to the United States. Once approved, the court-appointed monitor should be considered by the United States and Defendants to be an arm and representative of the Court.

B.     The monitor will have the power and authority to monitor Defendants' compliance with the terms of this Final Judgment and the Asset Preservation and Hold Separate Stipulation and Order entered by the Court and will have other powers as the Court deems

appropriate. The monitor will have no responsibility or obligation for operation of the Divestiture Assets.

C.  The monitor must investigate and report on Defendants' compliance with this Final Judgment and the Asset Preservation and Hold Separate Stipulation and Order, including Paragraphs IV.H, IV.K., IV.L, IV.M. and Section X. The monitor must provide periodic reports to the United States setting forth Defendants' efforts to comply with their obligations under this Final Judgment and under the Asset Preservation and Hold Separate Stipulation and Order. The United States, in its sole discretion, will set the frequency of the monitor's reports.

D.  The monitor will have the authority to take such steps as, in the monitor's discretion and the United States' view, may be necessary to accomplish the monitor's responsibilities. The monitor may seek information from Defendants' personnel, including in-house counsel, compliance personnel, and internal auditors. Defendants must establish a policy, annually communicated to all employees, that employees may disclose any information to the monitor without reprisal for such disclosure. Defendants must not retaliate against any employee or third party for disclosing information to the monitor.

E.  Defendants may not object to actions taken by the monitor in fulfillment of the monitor's responsibilities under any Order of the Court on any ground other than malfeasance by the monitor. Disagreements between the monitor and Defendants related to the scope of the monitor's responsibilities do not constitute malfeasance. Objections by Defendants must be conveyed in writing to the United States and the monitor within 10 calendar days of the monitor's action that gives rise to Defendants' objection or the objection is waived.

F.  The monitor will serve at the cost and expense of Defendant Safran pursuant to a written agreement, on terms and conditions, including confidentiality requirements and conflict

of interest certifications, approved by the United States in its sole discretion. If the monitor and Defendant Safran are unable to reach such a written agreement within 14 calendar days of the Court's appointment of the monitor, or if the United States, in its sole discretion, declines to approve the proposed written agreement, the United States, in its sole discretion, may take appropriate action, including making a recommendation to the Court, which may set the terms and conditions for the monitor's work, including the monitor's compensation.

G.     The monitor may hire, at the cost and expense of Defendant Safran, any agents and consultants, including investment bankers, attorneys, and accountants, that are reasonably necessary in the monitor's judgment to assist with the monitor's duties. These agents or consultants will be directed by and solely accountable to the monitor and will serve on terms and conditions, including confidentiality requirements and conflict-of-interest certifications, approved by the United States in its sole discretion. Within three business days of hiring any agents or consultants, the monitor must provide written notice of the hiring and the rate of compensation to Defendant Safran and the United States. The compensation of the monitor and agents or consultants retained by the monitor must be on reasonable and customary terms commensurate with the individuals' experience and responsibilities. The monitor must account for all costs and expenses incurred.

H.     Defendant Safran's failure to promptly pay the monitor's invoices and accounted-for costs and expenses, including for agents and consultants, will constitute a violation of this Final Judgment and may result in sanctions imposed by the Court. If Defendant Safran makes a timely objection in writing to the United States to any part of the monitor's invoices or accounted-for costs and expenses, Defendant Safran must establish an escrow account into which Defendant Safran must pay the disputed amount until the dispute is resolved.

I.      Defendants must use best efforts to cooperate fully with the monitor and to assist the monitor to monitor Defendants' compliance with their obligations under this Final Judgment and the Asset Preservation and Hold Separate Stipulation and Order. Subject to reasonable protection for trade secrets, other confidential research, development, or commercial information, or any applicable privileges, Defendants must provide the monitor and agents or consultants retained by the monitor with full and complete access to all personnel (current and former), agents, consultants, books, records, and facilities of the Divestiture Assets. Defendants may not take any action to interfere with or to impede accomplishment of the monitor's responsibilities.

J.      The monitor may communicate *ex parte* with the Court when, in the monitor's sole discretion, the monitor believes such communication is reasonably necessary to the monitor's duties under this Final Judgment, including if Defendant Safran fails to timely pay the monitor's invoices or accounted-for costs and expenses or if Defendants otherwise violate this Final Judgment.

K.      The monitor will serve until 180 calendar days after (1) the expiration of the last contracts between Defendants and Acquirer related to the operation of any of the Divestiture Assets pursuant to Paragraph IV.K, the provision of any transition services pursuant to Paragraph IV.L, the provision of any lease pursuant to Paragraph IV.M, or any other obligations of Defendants to Acquirer, and (2) the expiration of Defendants' obligations under Section X, unless the United States, in its sole discretion, determines a different period is appropriate.

L.      If the United States determines that the monitor is not acting diligently or in a reasonably cost-effective manner, or if the monitor resigns or becomes unable to accomplish the monitor's duties, the United States may recommend that the Court appoint a substitute monitor.

## IX.    COMPLIANCE INSPECTION

A.    For the purposes of determining or securing compliance with this Final Judgment or of related orders such as the Asset Preservation and Hold Separate Stipulation and Order or of determining whether this Final Judgment should be modified or vacated, upon written request of an authorized representative of the Assistant Attorney General for the Antitrust Division, and reasonable notice to Defendants, Defendants must permit, from time to time and subject to legally recognized privileges, authorized representatives, including agents retained by the United States:

1.    to have access during Defendants' office hours to inspect and copy, or at the option of the United States, to require Defendants to provide electronic copies of all books, ledgers, accounts, records, data, and documents, wherever located, in the possession, custody, or control of Defendants relating to any matters contained in this Final Judgment; and

2.    to interview, either informally or on the record, Defendants' officers, employees, or agents, wherever located, who may have their individual counsel present, relating to any matters contained in this Final Judgment. The interviews must be subject to the reasonable convenience of the interviewee and without restraint or interference by Defendants.

B.    Upon the written request of an authorized representative of the Assistant Attorney General for the Antitrust Division, Defendants must submit written reports or respond to written interrogatories, under oath if requested, relating to any matters contained in this Final Judgment.

## X.    FIREWALLS

A.    Defendant Safran must implement and maintain effective procedures to prevent Acquirer's competitively sensitive information from being shared or disclosed, by or through implementation and execution of the obligations required by this Final Judgment and any

associated agreements, including agreements entered pursuant to Paragraphs IV.K, IV.L, and IV.M, by the employees of Defendant Safran tasked with (1) operating the Divestiture Assets at Av. Sierra San Agustín 2498, Col el Porvenir, Parque Industrial Progreso, and 21185 Mexicali, B.C., Mexico, facilities ("Mexicali Facilities") for Acquirer, or (2) providing transition services to Acquirer (collectively, "Firewall Employees") and any other employees of Defendants. In particular, no employee of Defendant Safran assigned to, or with any management responsibility for, the Collins Aerospace flight control and actuation business may be given, or have access to, information about the production for Acquirer at the Mexicali Facilities, including information about demand, product, sales, or price.

B.      Defendant Safran must, within thirty (30) calendar days of the entry of the Asset Preservation Stipulation and Order, submit to the United States and, if one has been appointed, to the monitor, a compliance plan setting forth in detail the procedures Defendant Safran proposes to implement to effect compliance with this Section X. The United States must inform Defendant Safran within ten (10) business days of receipt whether, in its sole discretion, the United States approves or rejects Defendant Safran's compliance plan. Within ten (10) business days of receiving a notice of rejection, Defendant Safran must submit a revised compliance plan. The United States may request that the Court determine whether Defendant Safran's proposed compliance plan fulfills the requirements of this Section X.

C.      At minimum, an effective compliance plan must include, for all Firewall Employees, (1) initial written notice on or before the Divestiture Date, (2) training within thirty (30) days of the Divestiture Date followed by training on a yearly basis, and (3) provision of written acknowledgment of the obligations of this Section X within thirty (30) days of the Divestiture Date and on a yearly basis thereafter. The form of all written notifications must first

be reviewed by the monitor, if one has been appointed, and approved by the United States, in its sole discretion. Defendant Safran must maintain complete records of all written notices, training, employee acknowledgments, and all other efforts made to comply with this Section X until the termination of all contracts between Defendant Safran and Acquirer related to the operation of, support of, or transition services for the Divestiture Assets or five years after the Divestiture Date, whichever is later.

## XI.    NO REACQUISITION

Defendants may not reacquire any part of or any interest in the Divestiture Assets during the term of this Final Judgment without prior authorization of the United States.

## XII.    PUBLIC DISCLOSURE

A.    No information or documents obtained pursuant to any provision of this Final Judgment, including reports the monitor provides to the United States pursuant to Paragraph VIII.C, may be divulged by the United States or the monitor to any person other than an authorized representative of the executive branch of the United States, except in the course of legal proceedings to which the United States is a party, including grand-jury proceedings, for the purpose of evaluating a proposed Acquirer or securing compliance with this Final Judgment, or as otherwise required by law.

B.    In the event that the monitor receives a subpoena, court order, or other court process seeking or requiring production of information or documents obtained pursuant to any provision in this Final Judgment, including reports the monitor provides to the United States pursuant to Paragraph VIII.C, the monitor must notify the United States and Defendants immediately and prior to any disclosure, so that Defendants may address such potential

disclosure and, if necessary, pursue alternative legal remedies, including if deemed appropriate by Defendants, intervention in the relevant proceedings.

C.     In the event of a request by a third party, pursuant to the Freedom of Information Act, 5 U.S.C. § 552, for disclosure of information obtained pursuant to any provision of this Final Judgment, the Antitrust Division will act in accordance with that statute, and the Department of Justice regulations at 28 C.F.R. part 16, including the provision on confidential commercial information, at 28 C.F.R. § 16.7. Defendants submitting information to the Antitrust Division should designate the confidential commercial information portions of all applicable documents and information under 28 C.F.R. § 16.7. Designations of confidentiality expire 10 years after submission, "unless the submitter requests and provides justification for a longer designation period." *See* 28 C.F.R. § 16.7(b).

D.     If at the time that Defendants furnish information or documents to the United States pursuant to any provision of this Final Judgment, Defendants represent and identify in writing information or documents for which a claim of protection may be asserted under Rule 26(c)(1)(G) of the Federal Rules of Civil Procedure, and Defendants mark each pertinent page of such material, "Subject to claim of protection under Rule 26(c)(1)(G) of the Federal Rules of Civil Procedure," the United States must give Defendants 10 calendar days' notice before divulging the material in any legal proceeding (other than a grand jury proceeding).

## XIII. RETENTION OF JURISDICTION

The Court retains jurisdiction to enable any party to this Final Judgment to apply to the Court at any time for further orders and directions as may be necessary or appropriate to carry out or construe this Final Judgment, to modify any of its provisions, to enforce compliance, and to punish violations of its provisions.

## XIV.  ENFORCEMENT OF FINAL JUDGMENT

A.       If any time during the five years from entry of this Final Judgment, the United States determines in its sole discretion that the Final Judgment has failed to fully redress the violations alleged in the Complaint, then the United States may re-open this proceeding to seek additional relief, including divestiture of additional assets. Such additional relief may be ordered by this Court upon a finding by a preponderance of the evidence that there is a reasonable probability that the proposed Final Judgment did not fully redress the violations alleged in the Complaint.

B.       The United States retains and reserves all rights to enforce the provisions of this Final Judgment, including the right to seek an order of contempt from the Court. Defendants agree that in a civil contempt action, a motion to show cause, or a similar action brought by the United States relating to an alleged violation of this Final Judgment, the United States may establish a violation of this Final Judgment and the appropriateness of a remedy therefor by a preponderance of the evidence, and Defendants waive any argument that a different standard of proof should apply.

C.       This Final Judgment should be interpreted to give full effect to the procompetitive purposes of the antitrust laws and to restore the competition the United States alleges was harmed by the challenged conduct. Defendants agree that they may be held in contempt of, and that the Court may enforce, any provision of this Final Judgment that, as interpreted by the Court in light of these procompetitive principles and applying ordinary tools of interpretation, is stated specifically and in reasonable detail, whether or not it is clear and unambiguous on its face. In any such interpretation, the terms of this Final Judgment should not be construed against either party as the drafter.

D.    In an enforcement proceeding in which the Court finds that Defendants have violated this Final Judgment, the United States may apply to the Court for an extension of this Final Judgment, together with other relief that may be appropriate. In connection with a successful effort by the United States to enforce this Final Judgment against a Defendant, whether litigated or resolved before litigation, that Defendant agrees to reimburse the United States for the fees and expenses of its attorneys, as well as all other costs including experts' fees, incurred in connection with that effort to enforce this Final Judgment, including in the investigation of the potential violation.

E.    For a period of four years following the expiration of this Final Judgment, if the United States has evidence that a Defendant violated this Final Judgment before it expired, the United States may file an action against that Defendant in this Court requesting that the Court order: (1) Defendant to comply with the terms of this Final Judgment for an additional term of at least four years following the filing of the enforcement action; (2) all appropriate contempt remedies; (3) additional relief needed to ensure the Defendant complies with the terms of this Final Judgment; and (4) fees or expenses as called for by this Section XIV.

## XV.    EXPIRATION OF FINAL JUDGMENT

Unless the Court grants an extension, this Final Judgment will expire 10 years from the date of its entry, except that after five years from the date of its entry, this Final Judgment may be terminated upon notice by the United States to the Court and Defendants that the divestiture has been completed and continuation of this Final Judgment is no longer necessary or in the public interest.

## XVI. PUBLIC INTEREST DETERMINATION

Entry of this Final Judgment is in the public interest. The parties have complied with the requirements of the Antitrust Procedures and Penalties Act, 15 U.S.C. § 16, including by making available to the public copies of this Final Judgment and the Competitive Impact Statement, public comments thereon, and any response to comments by the United States. Based upon the record before the Court, which includes the Competitive Impact Statement and, if applicable, any comments and response to comments filed with the Court, entry of this Final Judgment is in the public interest.

Date: _November 25, 2025_

Court approval subject to procedures of Antitrust Procedures and Penalties Act, 15 U.S.C. § 16

United States District Judge
CHRISTOPHER R. COOPER
United States District Judge

## Schedule A

| | |
|---|---|
| SR. ELECTRO-MECHANICAL DESIGNER | SafranEDA Irvine, CA |
| SR PROJECT ENGINEER | SafranEDA Irvine, CA |
| SR PROJECT ENGINEER | SafranEDA Irvine, CA |
| SR. ENGINEERING PROJECT ASSISTANT | SafranEDA Irvine, CA |
| SR. ELECTRONICS TECHNICIAN | SafranEDA Irvine, CA |
| PR SYSTEMS ENGINEER | SafranEDA Irvine, CA |
| SENIOR ACCOUNTANT | SafranEDA Irvine, CA |
| PR SYSTEMS SAFETY ENGINEER | SafranEDA Irvine, CA |
| CONTRACTS MANAGER | SafranEDA Irvine, CA |
| DIRECTOR OF PROGRAM MANAGEMENT (ELLINGTON) | SafranEDA Irvine, CA |
| MECHANICAL ENGINEER | SafranEDA Irvine, CA |
| Sr. Program Manager | SafranEDA Irvine, CA |
| SR QUALITY ENGINEER | SafranEDA Irvine, CA |
| DIRECTOR - ENGINEERING (ELLINGTON) | SafranEDA Irvine, CA |
| SR STRESS ENGINEER | SafranEDA Irvine, CA |
| SR. SUPPLIER RELATIONSHIP MANAGER | SafranEDA Irvine, CA |
| SR. MECHANICAL ENGINEER | SafranEDA Irvine, CA |
| SR. ELECTRONICS TECHNICIAN | SafranEDA Irvine, CA |
| PR SYSTEMS ENGINEER | SafranEDA Irvine, CA |
| SR ELECTRICAL ENGINEER | SafranEDA Irvine, CA |